******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* AKOV ORTIZ
(SC 18946)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued January 13—officially released July 15, 2014*

*Pamela S. Nagy*, assigned counsel, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Peter A. McShane*, state's attorney, and *Timothy J. Liston*, former state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Akov Ortiz, appeals, following our grant of certification, from the judgment of the Appellate Court, which affirmed his conviction, rendered after a jury trial, of tampering with a witness in violation of General Statutes § 53a-151 (a), criminal trespass in the first degree in violation of General Statutes § 53a-107 (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that § 53a-151 (a) does not proscribe attempts to prevent an individual from speaking to the police because the statute requires the intent to affect a witness' conduct at an official proceeding. The defendant thus contends that the evidence in the present case was insufficient to establish his guilt with respect to his conviction of tampering with a witness. The state argues, however, that the broad definitions of "witness" and "official proceeding" encompass attempts to prevent an individual from speaking to the police when the defendant believes that an official proceeding is about to be instituted and the individual probably will be called as a witness at that proceeding.

We agree with the defendant that § 53a-151 (a) requires the intent to influence a witness' conduct at an official proceeding, but we also conclude that a jury may infer this intent from the defendant's attempt to prevent an individual from giving a statement to the police. See *State* v. *Cavallo*, 200 Conn. 664, 673–74, 513 A.2d 646 (1986). In the present case, the defendant went to the home of his former girlfriend, Kristen Quinn, with a gun and told her that, if she provided certain information to the police, "[her] house was going to go up in smoke . . . ." (Internal quotation marks omitted.) *State* v. *Ortiz*, 133 Conn. App. 118, 121, 33 A.3d 862 (2012). Because the jury reasonably could have found that the defendant believed that an official proceeding was about to be instituted and that Quinn probably would be called to testify at that proceeding, we conclude that the jury reasonably could have inferred that the defendant intended to induce Quinn to testify falsely or to withhold testimony at that proceeding. Accordingly, we affirm the judgment of the Appellate Court.

"The jury reasonably could have found the following facts from the evidence presented. On April 14, 1997, a burglary occurred at a residence located on Plains Road in [the town of] Haddam. During the course of the burglary, eight guns and a hunting knife were stolen. On April 17, 1997, the defendant told Louis Labbadia that he had committed the burglary. Labbadia reported this information to the police the same day.

"In July, 1998, the defendant went to the home of Labbadia's fiancée, Robin Bonita, in [the city of] Middletown. Bonita told the defendant that Labbadia 'had gone

to the police . . . .' On or about July 18, 1998, Labbadia was reported missing by his family. His remains were discovered on March 21, 1999, in Middletown." Id., 120.

Thereafter, the police considered the defendant a "principal suspect" in Labbadia's murder. As a result, the police contacted Quinn, who, at the time, did not provide the police with any useful information. Nonetheless, a few days after Labbadia's remains were found, Quinn informed the defendant that she was in contact with the police and did not want to be involved with the defendant because she thought he might have been involved in Labbadia's murder.

About one week later, on April 1, 1999, Officer Stephen G. Augeri and Detective Rick Spencer of the Middletown Police Department received a complaint that there was an intoxicated person on the Arrigoni Bridge in Middletown. The officers discovered the defendant, intoxicated, on the bridge upon arrival at the scene. The defendant appeared "[d]istraught" and "upset," and, after seeing the officers, told them "to stay back or he would jump." The defendant informed the officers that he "was tired of being accused of things, of something he didn't do, and that anytime anything big ever happen[ed] in Middletown, he [was] blamed for it." Specifically, the defendant stated that he "had heard that there were warrants for his arrest out through the Middletown Police Department" and that "the Middletown police [were] trying to kill [him]." He also stated that he "had already attempted to kill himself earlier in the day by slitting his wrist," and Augeri noticed that the defendant had a cut on his left wrist. Notably, while on the bridge, the defendant asked to speak with Detective Charles Jacobucci of the Middletown Police Department, one of the detectives assigned to the Labbadia murder investigation, in order to "to clear things up."

The defendant ultimately agreed to climb back over the bridge railing and to go to the hospital with the officers for an emergency psychological evaluation. At the hospital, the defendant spoke to Officer Scott Aresco of the Middletown Police Department, one of the investigators working on the Labbadia murder case, about Labbadia. The defendant appeared very nervous. The defendant told Aresco that he "was tired of being accused of something he didn't do" and that he "was hearing that the police were accusing him of killing . . . Labbadia." The defendant also stated that Labbadia "gave a statement against him [in a criminal investigation concerning the burglary in Haddam], which he was supposed to [recant]. He was supposed to go to court and talk on [the defendant's] behalf." The defendant informed Aresco that he "was never in the area where . . . Labbadia's remains were found."

On April 28, 1999, Jacobucci met with the defendant at the police station. At the outset, Jacobucci informed the defendant that "he was not in any trouble and [that]

he was free to leave at any time." Jacobucci asked the defendant for information about Labbadia, such as his background and who might have seen him last. The defendant informed Jacobucci that he had last seen Labbadia in the first week of June, 1998. The defendant also told Jacobucci that he "had to straighten something out with [Labbadia] about going to the cops, about shooting a cop at the Cenacle[1] . . . ."

In the following months, the defendant knew that Quinn was speaking with the police. "On June 13, 1999, the defendant went to [Quinn's] home . . . and knocked on her window. The defendant told Quinn that he had killed Labbadia by stabbing him with a knife. The defendant also told Quinn that he had dragged the body into a wooded area and disposed of the knife by throwing it in a river. The defendant indicated that, were it not for his conversation with Bonita, Labbadia would still be alive."[2] *State* v. *Ortiz*, supra, 133 Conn. App. 120. Quinn informed the defendant that he would be in trouble if he were caught around her house because she had been speaking with the police. After the defendant had left, "Quinn wrote down what the defendant had told her and showed these notes to her mother the following day. Shortly thereafter, this information was conveyed to [the] police.

"On August 7, 1999, the defendant again went to Quinn's home. The defendant showed Quinn 'a small handgun' and asked her to come outside. Quinn then exited the residence through her bedroom window. The defendant told Quinn that he had the gun for 'insurance' if she told 'the cops about what he said about [Labbadia].' The defendant said that if Quinn spoke to the police '[her] house was going to go up in smoke . . . .' The defendant stated that he knew where Quinn's grandparents lived. The defendant told Quinn that he was going to 'put [her down] on [her] knees, put the gun to [her] head and scare [her] straight.' " (Footnote omitted.) Id., 120–21. The defendant and Quinn discussed the fact that the murder weapon had not been found, although it is unclear which party informed the other of this information. Quinn subsequently informed the police of these events.

"At 10:30 p.m. on August 10, 1999, the defendant called Quinn to arrange a meeting at a school near Quinn's home. Quinn told her mother about the call, and her mother notified the police. [At approximately] 12:30 a.m. on August 11, 1999, the police apprehended the defendant at the school." Id., 121.

The defendant was charged with threatening, tampering with a witness, criminal trespass in the first degree, and carrying a pistol without a permit.[3] A jury found the defendant not guilty of threatening but guilty of the other charges.[4]

The defendant appealed from the judgment of convic-

tion to the Appellate Court, claiming, inter alia, that "(1) attempting to prevent someone from making statements to the police cannot violate [§ 53a-151 (a), and] (2) there was insufficient evidence that the defendant possessed the specific intent required for conviction of witness tampering . . . ." Id., 121–22. The Appellate Court determined that the defendant's first claim was foreclosed by *State* v. *Pommer*, 110 Conn. App. 608, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008). *State* v. *Ortiz*, supra, 133 Conn. App. 122. The Appellate Court also concluded that there was sufficient evidence to support the defendant's conviction of witness tampering, the defendant having confessed to Quinn and having appeared to be concerned that she would report this confession to the police. Id., 124.

The defendant then appealed to this court, and we granted his petition for certification limited to two questions: First, "[s]hould this court overrule *State* v. *Pommer*, [supra] 110 Conn. App. 608 . . . which holds that the act of preventing someone from giving a statement to the police falls within the witness tampering statute . . . § 53a-151 (a)?" *State* v. *Ortiz*, 304 Conn. 914, 40 A.3d 785 (2012). Second, "[i]f so, did the Appellate Court erroneously conclude that there was sufficient evidence to sustain the defendant's conviction of tampering with a witness?" Id. After hearing the parties' arguments and considering the case more fully, however, we conclude that the certified questions did not properly frame the issues that must be resolved.[5] Accordingly, we rephrase the certified questions to conform to the issues actually presented. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 183–84, 989 A.2d 1048 (2010). We recast the certified questions as follows: First, "does the witness tampering statute, § 53a-151 (a), proscribe the act of attempting to prevent someone from giving a statement to the police?" Second, "did the Appellate Court incorrectly conclude that there was sufficient evidence to sustain the defendant's conviction of tampering with a witness?"

With respect to the first certified question, the defendant claims that the plain language of § 53a-151 (a) does not proscribe attempts to prevent a witness from speaking to the police. Statements to the police fall outside the scope of the statute, according to the defendant, because the terms "testimony" and "testify" in § 53a-151 (a) include only statements made in an official proceeding. The defendant also relies on the omission of the words "investigation," "inform," and "informant" from § 53a-151 (a), when these terms appear in the Model Penal Code witness tampering provision from which § 53a-151 (a) was adapted. See 2 A.L.I., Model Penal Code and Commentaries (1980) § 241.6 (1), pp. 162–63. Finally, the defendant contends that the evidence in the present case was insufficient to support the jury's verdict with respect to the witness tampering charge because there was no evidence that the defen-

dant (1) believed that an official proceeding was about to be instituted, and (2) intended to induce Quinn not to testify. The state responds that the defendant's interpretation of § 53a-151 (a) is too limited and that the words "witness," "testify," and "testimony" can include attempts to prevent an individual from speaking to the police in certain circumstances. Therefore, the state argues that the evidence in the present case was sufficient to establish that the defendant tampered with a witness.

We conclude that, consistent with our decision in *State* v. *Cavallo*, supra, 200 Conn. 664, a jury may consider a defendant's attempt to prevent an individual from giving a statement to the police as evidence of his intent to influence the testimony of that individual at a future official proceeding. This conclusion is limited, of course, by the statutory requirements that (1) the defendant believe an official proceeding has been or is about to be instituted, and (2) the individual probably will be called to testify at that proceeding. In viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury in the present case reasonably could have found that the defendant believed an official proceeding was about to be instituted and that the defendant intended to induce Quinn not to testify or to withhold testimony at that proceeding. Accordingly, we affirm the judgment of the Appellate Court.

I

We begin with the first certified question, which requires us to determine whether attempts to prevent individuals from speaking with the police fall within the scope of § 53a-151 (a). The defendant contends that § 53a-151 (a) does not include such attempts but, rather, applies only when the defendant directly acts to influence a witness' testimony in an official proceeding. Although we agree that the defendant must intend to affect the witness' conduct in an official proceeding, this court previously has determined that a jury may infer this intent from a defendant's attempt to prevent an individual from speaking to the police in certain circumstances. See id., 673–74. Accordingly, we conclude that the jury may consider such actions as evidence of the defendant's intent to influence the future testimony of a witness at an official proceeding.

The present case requires us to interpret § 53a-151 (a). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other

statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State* v. *Jenkins*, 288 Conn. 610, 620, 954 A.2d 806 (2008).

Section 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding."[6] Thus, the witness tampering statute has two requirements: (1) the defendant believes that an official proceeding is pending or about to be instituted; and (2) the defendant induces or attempts to induce a witness to engage in the proscribed conduct. These requirements serve the purpose of part XI of the Connecticut Penal Code, in which § 53a-151 (a) is found, as they "punish those who interfere with the courts and our system of justice." *State* v. *Servello*, 80 Conn. App. 313, 323, 835 A.2d 102 (2003), cert. denied, 267 Conn. 914, 841 A.2d 220 (2004).

The defendant argues that § 53a-151 (a) requires the intent to induce a witness to, inter alia, testify falsely in an official proceeding. In support of this position, the defendant cites our decision in *Cavallo*, in which this court determined that § 53a-151 (a) "applies to any conduct that is intended to prompt a witness to testify falsely or to refrain from testifying *in an official proceeding* that the perpetrator believes to be pending or imminent." (Emphasis added.) *State* v. *Cavallo*, supra, 200 Conn. 668. Although we agree with the defendant that § 53a-151 (a) requires this intent, an examination of the facts and reasoning of *Cavallo* reveals that a jury may consider a defendant's attempt to induce a potential witness to lie to police investigators as evidence of his intent to affect that witness' conduct at a future official proceeding. See id., 673–74.

In *Cavallo*, the defendant, John Cavallo, then a police officer, often drank alcohol with a seventeen year old woman in his police cruiser. Id., 665. This conduct led to Cavallo's discharge from the police force. Id. Cavallo denied the allegations, however, and, "through his union representative, notified the [police] department [for which he worked] that he intended to bring the matter to arbitration." Id. Cavallo then told the woman that, "if investigators questioned her about their rela-

tionship, she should tell them that she had never been in [Cavallo's] police cruiser and should deny any knowledge of [Cavallo's] social use of the vehicle." Id. Cavallo repeated these instructions to the woman on multiple occasions. Id. He also informed her that "he had just been arrested for tampering with another young woman who was also a potential witness." Id., 665 n.1.

When police investigators eventually questioned the woman, "she claimed that she had never been in [Cavallo's] police cruiser and that [Cavallo] was guilty of no misconduct." Id., 666. Cavallo then called the woman to determine whether she had disclosed "any incriminating information" to the police investigators. Id. Approximately two weeks later, Cavallo initiated arbitration proceedings. See id. Despite her earlier, false statement, the woman subsequently informed the police investigators about her visits with Cavallo in his police cruiser and Cavallo's attempts to persuade her to deny these activities. Id.

Cavallo claimed on appeal that § 53a-151 was void for vagueness and that there was insufficient evidence to support his conviction. Id. The court first concluded that § 53a-151 was constitutional because it "plainly warns potential perpetrators that the statute applies to any conduct that is intended to prompt a witness to testify falsely or to refrain from testifying in an official proceeding that the perpetrator believes to be pending or imminent." Id., 668. The court further explained that, consistent with the provision of the Model Penal Code on which § 53a-151 (a) is based, § 53a-151 (a) "focuses on the mental state of the perpetrator to distinguish culpable conduct from innocent conduct." Id., 669.

With respect to the evidentiary sufficiency issue, the court concluded that the jury reasonably could have found Cavallo guilty of violating § 53a-151. Id., 674. Specifically, the court reasoned that the state had satisfied its burden of proving each element of the offense by adducing the following evidence at trial: "[Cavallo] had repeatedly instructed [the] woman to give a false account [to the police investigators] of her activities with [Cavallo] in his police cruiser. [The state] also introduced ample evidence to convince a reasonable finder of fact that, at the time of his attempts to so induce the woman, [Cavallo] had known that an arbitration proceeding would soon be pending and that, during the hearing, the woman would probably be called to testify about her meetings with [Cavallo] in the cruiser." Id., 673. The court thus concluded that, on the basis of the evidence presented, "the jury could reasonably have inferred that [Cavallo] intended to induce the woman to testify falsely [at the arbitration hearing]." Id., 673–74.

The unspoken, but logical, step in this analysis is that a jury reasonably could infer the requisite intent to induce the woman to lie at the arbitration hearing from, inter alia, Cavallo's attempt to induce her to lie to police

investigators. "Intent may be, and usually is, inferred from [a] defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant *intended the natural consequences of his voluntary conduct.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Pommer*, supra, 110 Conn. App. 618–19. Because an official proceeding was about to be instituted and the woman probably would be a witness, it is reasonable to infer that Cavallo intended the natural consequences of his act, that is, to induce the woman to testify falsely at the arbitration hearing. Put differently, it is hard to imagine a scenario in which Cavallo, believing that an arbitration proceeding was about to be instituted and that the woman probably would be summoned as a witness, would intend to induce the woman to lie to investigators but *not* also intend for her to lie at the arbitration hearing.

The Appellate Court followed this reasoning in *State* v. *Pommer*, supra, 110 Conn. App. 619–20, and *State* v. *Higgins*, 74 Conn. App. 473, 483–85, 811 A.2d 765, cert. denied, 262 Conn. 950, 817 A.2d 110 (2003). Although the defendant and the state suggest that *Pommer* extended § 53a-151 (a) to encompass statements to the police, *Pommer* is entirely consistent with *Cavallo*, as the Appellate Court concluded in *Pommer* that the jury could infer the defendant's intent from his conduct toward a potential witness prior to the institution of an official proceeding.[7] See *State* v. *Pommer*, supra, 620. In *Pommer*, the defendant, Richard Pommer, and two accomplices committed a robbery and then escaped in a vehicle driven by Pommer's girlfriend, Melissa Fragola. Id., 611. Fragola later told one of the accomplices, Chaz Poole, that she was going to turn herself in to the police, and she later did so and gave a statement implicating Pommer. Id. Knowing that Fragola had made this statement, Pommer called Poole and asked him whether he was going to speak to the police as well. Id. When Poole told Pommer that he planned to do so, Pommer stated that "he loved [Poole] like a brother, but if Poole went to the police, it would be [Poole's] ass." (Internal quotation marks omitted.) Id. Pommer was later charged with, inter alia, witness tampering pursuant to § 53a-151 (a), and the jury found Pommer guilty of that charge. See id., 610.

Pommer appealed to the Appellate Court, claiming, inter alia, that there was insufficient evidence for the jury to find that he had tampered with a witness. See id. The Appellate Court disagreed, concluding, with respect to the requirement that the defendant intend for the witness to testify falsely, that "[t]he jury reasonably could have inferred that [Pommer's] slang expression

was a threat, [which was] designed to prevent Poole, a witness to the events, from giving information to the police and, thus, to withhold evidence [that] would implicate [Pommer] in an official proceeding that was imminent, namely, an arrest followed by a criminal prosecution resulting in a trial in which testimony would be taken under oath." Id., 620. The Appellate Court also concluded that the jury reasonably could have found that Pommer believed that an official proceeding was about to be instituted because, under § 53a-151 (a), "it is enough . . . that an official proceeding is 'about to be instituted' and is therefore imminent if a defendant, knowing he has been implicated as a participant in a crime, threatens a likely witness to that crime, to withhold evidence from the police, who . . . play a crucial role in the commencement of criminal prosecutions." Id., 618; see also *State* v. *Higgins*, supra, 74 Conn. App. 484–85 (concluding that evidence was sufficient to support conviction of witness tampering when jury reasonably could have concluded that defendant engaged in improper sexual conduct with victim and subsequently demanded that she tell police that "nothing ever happened" [internal quotation marks omitted]).[8]

The defendant also contends that, because § 53a-151 (a) is based on § 241.6 (1) of the Model Penal Code[9] but § 53a-151 (a), unlike § 241.6 (1), does not contain the words "investigation," "inform," or "informant," the legislature did not intend for § 53a-151 (a) to apply to situations in which the defendant seeks to prevent an individual from speaking with the police. We agree that the legislature restricted the scope of the witness tampering statute by omitting these words, but the scope of the restriction was minimal.

First, the omission of the word "investigation" does not mean that statements made during an investigation are excluded because the application of the statute does not depend on the actual stage of police involvement. Instead, § 53a-151 (a) applies whenever the *defendant* believes that an official proceeding will probably occur, even if the police are only at the investigation stage. Section 53a-151 (a) requires that a defendant "*believ*[e] that an official proceeding is pending or about to be instituted . . . ." (Emphasis added.) Although the statute does not specify whether the term "belief" is judged by an objective or subjective standard, this court previously has determined that the statute "focuses on the mental state of the perpetrator to distinguish culpable conduct from innocent conduct." *State* v. *Cavallo*, supra, 200 Conn. 669. Thus, § 53a-151 (a) applies to "any conduct that is intended to prompt a witness to testify falsely or refrain from testifying in an official proceeding that *the perpetrator believes* [is] pending or imminent." (Emphasis added.) Id., 668. This interpretation finds support in the official comments to § 241.6 (1) of the Model Penal Code, which note that § 241.6 (1) "focuses on the individual actor's culpability and

not on external factors that may be irrelevant to the actor's aim of subverting the administration of justice" and "eliminate[s] the purposeless quibbling invited by laws requiring that a proceeding or investigation actually be pending or in fact be contemplated by the authorities." Model Penal Code and Commentaries, supra, § 241.6 (1), comment 2, p. 166. Put simply, under § 53a-151 (a), as long as the *defendant* believes that an official proceeding will probably occur, it does not matter whether an official proceeding is *actually* pending or is about to be instituted.

The phrase "about to be instituted" in § 53a-151 (a) is somewhat ambiguous, as the statute does not reveal whether it connotes probability of occurrence or temporal proximity. We conclude that "about to be instituted" signifies probability, as mere temporal proximity does not sufficiently implement the goal of punishing the obstruction of justice. This interpretation is consistent with this court's reading of an identical phrase in the related statute proscribing the tampering of physical evidence, General Statutes § 53a-155 (a).[10] See *State* v. *Foreshaw*, 214 Conn. 540, 551, 572 A.2d 1006 (1990) (reasoning that § 53a-155 [a] "speaks to that which is *readily apt to come into existence or* [*to*] *be contemplated*" [emphasis added]). It is also consistent with the official comments to § 241.6 (1) of the Model Penal Code, which provide that this phrase "should be construed *more in the sense of probability than of temporal relation.* What is important is not that the actor believe that an official proceeding or investigation will begin within a certain span of time but rather that he recognize that his conduct threatens obstruction of justice." (Emphasis added.) Model Penal Code and Commentaries, supra, § 241.6 (1), comment 2, p. 167.

Thus, the omission of the term "investigation" from § 53a-151 (a) does not mean that attempts to influence witnesses that happen to occur during a police investigation are excluded from the purview of the statute. Instead, the omission of "investigation" was intended to exclude from the scope of the statute situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur. For instance, consider a scenario in which an individual commits a crime that results in no physical evidence, and in which the individual thereafter attempts to prevent the one witness to the crime from speaking to the police. The individual certainly could believe that the police would investigate the crime, but he would have no reason to believe that an official proceeding would probably occur because there would be no evidence or witnesses on which the police could rely to identify and arrest the individual. In contrast, when an individual knows that there is significant evidence connecting him to the crime, or, even further, when the individual knows that a witness with relevant information already has spoken with the police, a jury reasonably could

infer that the individual believed that the investigation probably would progress into an official proceeding.

We also note that the Model Penal Code does not define the term "witness," whereas our statutory definition of the term is broad. General Statutes § 53a-146 (6) defines "witness" as "any person summoned, *or who may be summoned*, to give testimony in an official proceeding." (Emphasis added.) In contrast, the official comments to § 241.6 (1) of the Model Penal Code suggest that, for purposes of its witness tampering provision, "an informant becomes a witness with the issuance of legal summons." Model Penal Code and Commentaries, supra, § 241.6 (1), comment 2, pp. 170–71. Thus, it does not necessarily follow that the omission of the term "informant" from our own statute means that all statements made by an individual to the police are excluded from the purview of the statute because our statutory definition of "witness" would overlap, at times, with the Model Penal Code's conception of an "informant." Rather, the omission of "informant" from our statutory scheme simply means that an individual who does not qualify as a "witness" under § 53a-146 (6) does not fall within scope of the statute.

In sum, the jury may consider the defendant's attempt to prevent a potential witness from speaking with the police as evidence of his intent to induce the witness to engage in conduct prohibited by § 53a-151 (a). Accordingly, it does not matter whether the police are at the investigation stage, the official proceeding stage, or any other stage; as long as the defendant acts with the intent to prevent a witness from testifying at an official proceeding, believing that such a proceeding will probably occur, the defendant has tampered with a witness within the meaning of § 53a-151 (a).

## II

We next consider whether the evidence in the present case was sufficient to permit the jury to reach a guilty verdict with respect to the witness tampering charge. The defendant argues that there is no evidence indicating that (1) he believed an official proceeding was about to be instituted, and (2) he threatened Quinn with the intent to induce her to withhold testimony at a criminal trial. We disagree.

When reviewing a sufficiency of the evidence claim, "we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury. Instead, our review consists of a two-step process in which we construe the evidence presented at trial in a light most favorable to sustaining the verdict . . . and then determine whether the jury could reasonably have found, [on the basis of] the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt."

(Citations omitted; internal quotation marks omitted.) *State* v. *Cavallo*, supra, 200 Conn. 673.

First, there was substantial evidence on which the jury could have relied to find that the defendant believed an official proceeding would probably occur. The defendant confessed to at least two individuals that he had killed someone. He knew that one of those individuals, Quinn, was in contact with the police. In fact, the defendant himself had been in contact with the police on two occasions. After Labbadia's remains were found, the defendant exhibited suicidal behavior and repeatedly requested to speak to an investigator who was working on the Labbadia murder case. He stated to Middletown police officers that he "had heard there were warrants for his arrest out through the Middletown Police Department" and that "the Middletown police [were] trying to kill [him]." This behavior indicates that the defendant believed that an official proceeding probably would be instituted, regardless of whether Quinn informed the police about the defendant's confession.[11]

In addition, the jury reasonably could have found that the defendant intended to induce Quinn to testify falsely or withhold testimony at an official proceeding. The defendant arrived at Quinn's home with a gun and "told Quinn that he had the gun for 'insurance' if she told 'the cops about what he said about [Labbadia].' The defendant said that if Quinn spoke to the police '[her] house was going to go up in smoke . . . .' " *State* v. *Ortiz*, supra, 133 Conn. App. 121. In fact, the defendant had confessed to Quinn that he had murdered Labbadia for almost identical reasons. A jury could infer that the defendant intended the natural consequences of this threat—that she not only withhold information from the police but also withhold testimony or provide false testimony at a future official proceeding. As in *Cavallo*, it is difficult to imagine a situation in which the defendant, believing that an official proceeding would occur at which Quinn would probably testify, would seek to prevent Quinn from speaking to the police about his confession but would not intend for her to lie at the future criminal trial.

Thus, considering the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the cumulative effect of the evidence established the defendant's guilt, with respect to the charge of tampering with a witness, beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] The Cenacle was an old, abandoned building in Middletown.

[2] The defendant's statement to Quinn was not his only confession. At some point in late 1998 or early 1999, the defendant also told Jeremiah Marselli, the former boyfriend of Labbadia's sister, that he had killed someone.

[3] "These charges pertain to the events of August 7, 1999. The defendant was charged separately for crimes pertaining to the murder of Labbadia

and the [burglary] that occurred on April 14, 1997. Although these charges were eventually consolidated, only those charges relating to the defendant's interaction with Quinn are relevant to the present appeal." *State* v. *Ortiz*, supra, 133 Conn. App. 121 n.3.

[4] The defendant was sentenced to six years imprisonment for his conviction on the charges of tampering with a witness, criminal trespass in the first degree, and carrying a pistol without a permit.

[5] The first certified question does not properly frame the issue presented to this court because it does not correctly describe the Appellate Court's holding in *Pommer*. As we explain in this opinion, *Pommer* did not hold that an attempt to prevent an individual from speaking with the police falls within the ambit of § 53a-151 (a) but, rather, reasoned that such an attempt could be considered evidence of the defendant's intent to induce a potential witness to engage in improper conduct at a future official proceeding. See *State* v. *Pommer*, supra, 110 Conn. App. 619–20. The second certified question also does not properly frame the issue because the defendant's claim is not contingent on our answer to the first question. We therefore recast the questions to conform to the arguments as presented in the defendant's brief and at oral argument. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 183–84, 989 A.2d 1048 (2010).

[6] The term "witness" is broadly defined as "any person summoned, *or who may be summoned*, to give testimony in an official proceeding . . . ." (Emphasis added.) General Statutes § 53a-146 (6). The statutory scheme also includes a broad definition of "official proceeding," that is, "any proceeding held *or which may be held* before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." (Emphasis added.) General Statutes § 53a-146 (1).

[7] In his concurrence in the Appellate Court's decision in *Ortiz*, Judge Bishop suggests that *Pommer* does not direct the outcome of the present case because the court did not analyze the terms "witness" and "testimony" and did not address the omission of the term "investigation" from § 53a-151, even though that term appears in the Model Penal Code provision on which § 53a-151 (a) is based. See *State* v. *Ortiz*, supra, 133 Conn. App. 130, 135 (*Bishop, J.*, concurring in part and concurring in the judgment). Although *Pommer* did not specifically analyze these terms or address the differences between our statute and § 241.6 (1) of the Model Penal Code, the reasoning and outcome of *Pommer* are consistent with our interpretation of § 53a-151 (a) and the official comments to § 241.6 (1) of the Model Penal Code. Furthermore, Judge Bishop observed that the court in *Pommer* improperly relied on this court's decision in *State* v. *Foreshaw*, 214 Conn. 540, 572 A.2d 1006 (1990); see *State* v. *Ortiz*, supra, 132–33 (*Bishop, J.*, concurring in part and concurring in the judgment); which interpreted the tampering with physical evidence statute, General Statutes § 53a-155. See *State* v. *Foreshaw*, supra, 547. Specifically, Judge Bishop stated: "Although it fairly can be argued that the conduct of a person in destroying or secreting evidence to keep it from police discovery during an investigation invariably compels a necessary inference that the actor intends, as well, for the evidence to be unavailable in any proceeding likely to ensue from the police investigation, a similar inference is not necessarily compelled from the conduct of an actor who asks another not to talk with the police during an investigation. In the latter case, whether asking a person not to talk with the police during an investigation permits a reasonable inference that, by such conduct, the actor has also attempted to influence that person's testimony in an official proceeding likely to ensue will vary depending on the facts and circumstances that pertain." *State* v. *Ortiz*, supra, 132–33 (*Bishop, J.*, concurring in part and concurring in the judgment). We agree that the inferences made from a defendant's conduct will depend on the facts and circumstances of each individual case under both §§ 53a-151 (a) and 53a-155. Thus, we do not agree, as Judge Bishop suggests, that these inferences are invariably compelled as a matter of law but, instead, conclude that the defendant's belief and intent are questions of fact for the jury to decide.

[8] The defendant also relies on several decisions from other states in support of his position. Some of these decisions are not necessarily contrary to our interpretation of § 53a-151 (a). See *State* v. *Bailey*, 346 Or. 551, 564, 213 P.3d 1240 (2009) ("to constitute a violation of the [witness tampering] statute, the offender's knowing inducement or intended inducement must reflect, *either directly or by fair inference*, that the offender at that time specifically and reasonably believes that the victim will be called to testify

at an official proceeding" [emphasis added]); see also *State* v. *LaPointe*, 418 N.W.2d 49, 50, 52 (Iowa 1988) (evidence insufficient to establish witness tampering when defendant offered to pay prospective witness money after he struck and injured her and she had informed defendant that she had not spoken to police and did not intend to press charges). Other decisions do not provide us with much guidance as they interpret a witness tampering statute that has different requirements from our own. See *J.L.R.* v. *State*, 756 So. 2d 1088, 1089 (Fla. App. 2000) (statute expressly encompasses witness tampering in context of investigations); *State* v. *Todd*, 805 S.W.2d 204, 206 (Mo. App. 1991) (statute requires that official proceeding is pending); *State* v. *Kilgus*, 125 N.H. 739, 742, 484 A.2d 1208 (1984) (statute expressly encompasses witness tampering in context of investigations).

[9] Section 53a-151 (a), as well as many other statutes in the Connecticut Penal Code, is based on the comparable provision in the Model Penal Code. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 541, 949 A.2d 1092 (2008).

Section 241.6 (1) of the Model Penal Code provides: "Tampering. A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted, he attempts to induce or otherwise cause a witness or informant to:

"(a) testify or inform falsely; or

"(b) withhold any testimony, information, document or thing; or

"(c) elude legal process summoning him to testify or supply evidence; or

"(d) absent himself from any proceeding or investigation to which he has been legally summoned."

[10] General Statutes § 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, *believing that an official proceeding is pending, or about to be instituted*, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ."

[11] The defendant claims that many of these events occurred months prior to his alleged tampering of Quinn. We do not find it unreasonable, however, for the jury to have inferred that the defendant believed an official proceeding was still probable four months after the victim's remains were found, especially in light of the other evidence against him.

---